FERNANDO GIRALDO, Respondent, v ALINA B. GIRALDO, Appellant.

First Department, March 2, 1982

**APPEARANCES OF COUNSEL**

*Thomas F. Tivnan* of counsel (*Vincent J. Malone* with him on the brief; *Parker, Duryee, Zunino, Malone & Carter,* attorneys), for appellant.

*E. Robert Fussell* of counsel (*Cooney, Fussell & Humphrey,* attorneys), for respondent.

OPINION OF THE COURT

*Per Curiam.*

Petitioner Fernando Giraldo brought this proceeding in the Family Court to obtain custody of his three daughters. Fernando and respondent Alina Braden Giraldo were married in New Providence, New Jersey, on December 6, 1968. During the marriage, the parties resided in Colombia, South America. On August 20, 1980, the parties entered into a separation agreement in Medellin, Colombia; that agreement was to cover the parties' conduct for a period of six months. Under the agreement, Alina, an American citizen, was to retain custody of the children in an apartment. However, Fernando, a Colombian citizen, was granted the right to see the children and take them as long as he did not interfere with their schooling and did not jeopardize their moral, mental and physical well-being. Alina traveled with the three children to New York City on December 19, 1980, while the agreement was still in force. It was her contention that she executed the agreement under duress and that she fled Colombia to avoid petitioner's violent conduct. In the custody proceeding brought by Fernando on March 5, 1981, extensive testimony was taken on five hearing dates. The testimony of the parties and their witnesses conflicted on many critical points; the principal areas of divergence will be highlighted.

According to Alina, she left college in order to marry Fernando. Marital problems began in the mid-1970's. As related by Alina, Fernando struck her and screamed at her on a regular basis. He called her, *inter alia,* a whore. Fernando told their oldest daughter, Alina Maria, that she was not the natural child of respondent Alina. In 1976, Alina was hospitalized because of an unfavorable reaction from sleeping pills. She maintained that this was not a suicide attempt but that she suffered a reaction because of dehydration due to a migraine headache. At the time, the petitioner expressed a wish that she should die. During the 1977-1978 period, she saw two psychiatrists. Petitioner went to counselling with her but he refused any treatment. Her treatments terminated in 1978 but she took the oldest child for consultation in 1980 since the child had been

affected by the statement that respondent was not her natural mother. Alina contended that Fernando was an alcoholic and she had encouraged him on many occasions to visit Alcoholics Anonymous.

During her marriage, Alina had taught in two different schools in Colombia. She maintained that she vigilantly guarded the children's health, supervised their education and kept a proper household. After the separation agreement was signed, the petitioner allegedly came to the apartment and removed various household items. The lock on the door was not changed because Fernando was violent and would find a way into the apartment. When she left Colombia in December of 1980, she learned that someone had signed petitioner's signature to certain documents used to facilitate the departure.

In her testimony, Alina stated that the children were attending St. Ignatius Loyola Grammar School in New York City and were doing quite well. Respondent was employed at that same school. She resided with her parents in an apartment on East 71st Street in Manhattan. Her parents loved the children and gave them guidance and support. If the children were returned to Colombia, they would be required to live with the petitioner's 78-year-old mother who was in ill health. The petitioner, because of his business interests, would not be at home in Colombia to provide proper guidance to the children. Moreover, if she returned to Colombia, there is a chance that she might be prosecuted.

Fernando's version of events was essentially different from that of his wife. He had received a portion of his higher education in the United States. Later, he had been manager of Banco Mercentil in Medellin, Colombia. He then became a representative of a French bank, Credit Lyonnais; he was also on the board of directors of a major coffee grower and exporter. His work required him to travel occasionally.

Fernando denied almost every allegation made by the respondent. He denied that he screamed at her or struck her. He denied he was an alcoholic but admitted he drank socially. On Saturdays, he conceded that he had as many as

five drinks. He admitted going to the apartment during the separation period but he averred that his action was within the terms of the separation agreement. He only removed those items from the apartment that belonged to him or which the respondent permitted him to remove. He took the children to school every day. Fernando took the children to church every Sunday but he could not remember the name of the priest. The respondent did not go to church with them. Although the telephone had been removed from respondent's apartment, the children often called him six or seven times on a particular afternoon.

The respondent's parents had opposed the marriage. The respondent's mother was Cuban; she disliked Colombians. His in-laws rarely saw the respondent or the children during the marriage. The parents had no relationship with him at all. After Alina had returned from the United States on one occasion in the mid-1970's, she began to act differently. In 1976 she attempted suicide. He expressed his sorrow and regrets at this attempt. Her psychiatric treatments continued until one month before she fled to the United States in 1980. He had often admonished her for failing to maintain a proper household and in failing to be watchful with regard to their daughter's health.

It was petitioner's contention that his daughters were brought up in the Colombian culture and they should continue in that culture. His mother was well and she could assist him in raising the children. At present, the children were living in crowded quarters in his in-laws' apartment. His letters to the children were not being given to them by Alina or her parents. The respondent had breached the separation agreement by forging his name to a certain document when she fled Colombia. She should not be permitted to benefit by her wrongdoing in that regard.

On the third hearing day, the court examined in chambers the oldest child, Alina Maria, then 11 years of age. The court, asking leading questions, received answers from the child that apparently surprised the court:

"Q. You must be homesick for Medellin, aren't you?

"A. No.

"Q. You lived there all of the time, didn't you?

"A. No, but you know it is bad there, I don't really like Medellin too much, I think it is better here and you have better things here. Mostly we live in peace here that is it is the better thing that's why we came because we would live in peace here, we don't have somebody yelling and screaming at us all the time.

"Q. Who was doing that?

"A. My father and he hit my mother and said bad words so I don't really know the words in English but they were like really bad words.

"Q. He wouldn't say bad words that children would hear, would he?

"A. He did, he did, and in front of us, in front of you, in front of us, he goes and hits my mother and said bad words to her. One time he —

"Q. How did he hit her, I don't understand that?

"A. Because when he loves to control so maybe when he lose the bottom most times from his jacket he yells and he screams to her and he slap her in face because she fell down and my mother don't have the floor because it fell down."

The child also testified that her mother had recently received a letter sent by the petitioner. She reiterated that she and her sisters had a good life in New York City. Alina Maria further stated that she and her sisters were afraid of their father and they did not wish to stay with him overnight. At the end of this examination, the court informed the child that she and her sisters would be required to go with the petitioner for visitation purposes. The minutes indicate that the child then began to cry. When the hearing Judge returned to the courtroom, she announced that the child had been "brainwashed" by the mother and that the child had been lying during the examination.

Two other witnesses testified at the hearing. Ronald Levy, a representative of the Society for the Prevention of Cruelty to Children, stated that he observed Fernando and the children enjoying a "happy" relationship in a local restaurant while visiting with the children.

Spruille Braden, Alina's father, acknowledged that he had always opposed the marriage after he had checked the petitioner's background. In his estimation, his daughter was a competent mother.

On the second day of the hearing, respondent's attorney asked that the parties and the children be directed to submit to the psychiatric and the psychological services of the court. The court considered the fact that the request was belated and that there would be approximately a six-week delay if such services were sought. It also took cognizance of the fact that petitioner wished to return to his business interests in Colombia. Considering these factors and its own expertise in evaluating character traits and mental deficiencies, the court denied respondent's motion in this matter. In passing, it should be observed that both parties mentioned that they had letters and reports from various doctors. However, these documents were never accepted into evidence.

During the course of the trial, various difficulties arose concerning the visitation privileges sought by the petitioner. Initially, such visitation was held in the office of respondent's attorney. On one occasion there is some indication that petitioner's mother-in-law was listening at a door while the petitioner spoke with his children. On another occasion, the petitioner attempted to meet the children in the lobby of his in-laws' apartment building. The children appeared in the lobby but they hysterically refused to go with their father. Subsequently they did go with the father for a period of visitation ordered by the court.

In an extended oral decision, the hearing court granted custody to the petitioner with visitation rights to the respondent in Colombia. The court found that neither parent was unfit in any definitive fashion. The respondent's credibility was found to be extremely low and it was found that she fabricated much of her testimony. On almost every disputed point in the trial, the court credited the testimony of the petitioner. Thus, the court found, *inter alia,* that the petitioner (i) did not hit the respondent, (ii) did not curse, (iii) was not an alcoholic, (iv) did not take items improperly from the respondent's apartment. The

court further found that (i) petitioner's mother was in good health, (ii) the respondent deliberately took an overdose of sleeping pills, and (iii) letters were withheld from the children.

The court determined that the respondent was presently stable. However, the respondent exercised a lack of judgment and uncontrollable impulsiveness in removing the children from Colombia. The trial court concluded that this was an evidence of continuing instability. By her conduct, the respondent showed that she was less stable than the petitioner. The respondent's mental aberrations were due to internal causation; the petitioner did not cause her to flee from Colombia. The court, in passing, recognized that a report from the psychiatrist who had counselled the parties in Colombia would have been valuable. The testimony of the oldest child, Alina Maria, was discounted on the ground that the child displayed the same tendency for fabrication and half-truths as the mother.

The court's conclusions were based upon its observations of the witnesses. The court also stated that, in context, the respondent's testimony was incredible. For example, the court reasoned that the petitioner could not be an alcoholic, otherwise, the respondent would never have entrusted the children to his care upon a regular basis. Similarly, the court reasoned that the petitioner could not be violent, otherwise, the respondent would have called the police or changed the lock.

After dictating the decision, the court denied respondent's motion for a temporary stay until her attorney could come to the Appellate Division for a permanent stay pending appeal. The hearing court denied the temporary stay because of the "dishonest dealings" of the respondent. The court then made several orders to expedite the petitioner's departure from this country. At the court's request, Mr. Levy apparently escorted the petitioner and the children to the airport for their immediate departure. The children are now in Colombia.

■ There is no issue on this appeal with regard to the fact that this State has jurisdiction and that its laws apply. In this proceeding, custody must be awarded in accordance

with the best interests of the children. (Domestic Relations Law, § 240, subd 1; Family Ct Act, § 651, subd [a]; *Matter of Bennett v Jeffreys,* 40 NY2d 543, 549.) Generally, the question of custody is a matter of discretion for the hearing court and its determination is rarely upset by an appellate court. However, the hearing court's discretion is not absolute and it may be set aside where it lacks a sound and substantial evidentiary basis (*Matter of Darlene T.,* 28 NY2d 391, 395). The hearing court was presented with the more narrow issue of whether the respondent was justified in fleeing Colombia. If the petitioner had actually subjected the respondent to physical and mental abuse, then her action in fleeing Colombia was warranted and custody should have been awarded to her. If, on the other hand, the evidence showed that the respondent was psychotic, suicidal and otherwise unstable, then exclusive custody was properly awarded to the petitioner. The truth, of course, might lie somewhere between these two extreme positions.

■ The hearing court in this proceeding was required to decide very difficult factual questions on limited evidence, i.e., the testimony of the parties and their oldest child. Major witnesses, who otherwise would be called, were not called because they resided in Colombia. Thus, many issues that would normally be resolved through the aid of objective evidence, were decided through the subjective evaluation accorded to the parties and their oldest child by the hearing court. We do not believe that the critical question of custody should be decided upon such limited evidence when independent evidence could have been obtained in the near future through the reasonable efforts of the parties and the auxiliary services of the court system.

More particularly, it cannot be said that the hearing court abused its discretion in originally denying respondent's motion for psychiatric and psychological testing of the parties and their children. If for no other reason, the motion was properly denied as untimely. Undoubtedly, the hearing court acted in good faith when it expressed the belief that it had the expertise and experience to evaluate the mental deficiencies and character traits of the parties and their children. However, the court's decision in this regard was made at an early stage in the hearing. As the

hearing progressed in length and scope, it should have become evident to the court that independent evidence was needed and should have been sought.

For example, both parties saw one psychiatrist for over a one-year period in Colombia. Reasonable efforts should have been made by both parties to examine that psychiatrist so that his testimony would be admissible at the hearing. (CPLR 3117, subd [a], par 3, cl [ii].) The examination could have been sought through letters rogatory or an open commission. The psychiatrist's testimony would have thrown light upon many areas of the parties' relationship and would have served as an independent predicate for the determination. That testimony might have revealed the true causation of respondent's depression, and might have avoided the conjecture necessarily latent in the hearing court's decision. It might have also revealed whether the petitioner had struck the respondent and whether he was an alcoholic. The use of deposition in Colombia could extend to other relevant matters, e.g., the respondent's attempted suicide and the health of petitioner's mother.

The hearing court should have realized the need for independent opinion when it eventually found that the oldest child, Alina Maria, was "brainwashed". Up until that part in the record, there is no evidence from which to draw that conclusion. Before the hearing court summarily rejected the testimony of the child who otherwise appeared to be alert and responsive, an examination by a court-appointed psychiatrist or psychologist or both should have been ordered. Likewise, the court should have directed an examination of the parties to determine whether the petitioner was actually more stable than the mother at the time of the hearing. Although these examinations might have taken six weeks or more, the custody issue was of such critical importance as to warrant a continuance of that length. While the petitioner might have been inconvenienced by such a ruling, the record demonstrates that he had the financial resources and the time to return on an adjourned date.

We must take this opportunity to make an additional remark upon a portion of the hearing court's reasoning in awarding custody to the father. In many instances, the

court reasoned that the petitioner could not be violent because the respondent did not take certain alternative actions that appeared logical and advisable if exigent circumstances were really present. For example, the respondent never changed her lock nor summoned the police, although she charged the petitioner with being violent. If the respondent was truly afraid or acting under duress, it is possible that she was hesitant to take remedial or protective action that one might pursue, as a matter of course, in the United States. The respondent's action or inaction must be viewed in terms of the foreign culture and the influential position of her husband. While the respondent's failure to take certain remedial and protective actions may be considered of some minimal evidentiary value, it may not be considered conclusive evidence that she was not acting under duress or that the petitioner was nonviolent. The prime question of whether the petitioner struck and intimidated the respondent is one that must be answered from other evidentiary data and through other reasoning processes of a more logical nature.

Upon the evidence presented, we must also express our reservations with regard to the fact that the hearing court was unable to find any area of the petitioner's testimony to be less than credible. For example, the petitioner stated that his children called him six or seven times in an afternoon but there was no telephone in the apartment. He allegedly never screamed at the respondent even though their marital discord extended over five years. The petitioner took the children to church every Sunday but he did not know the name of the priest. These and other statements show that the petitioner was not entirely credible in his testimony. While we would not reverse on the ground that the hearing court's determination was against the weight of the evidence presented, we would merely note that the evidence was not as one-sided as depicted in the court's oral opinion.

Summarizing, the evidence in this record does not permit us to make an informed judgment as to who should obtain custody. The hearing court abused its discretion in failing to order independent psychiatric and psychological testing once it became evident that its decision would turn

upon such an evaluation of the parties and their oldest child. The attorneys for both parties were also remiss in not making reasonable efforts to acquire actual evidence that is available in Colombia. Reasonable efforts should be made by the parties before the new hearing to acquire that evidentiary data that will assist the court.

A passing remark must also be made with regard to the court's failure to grant a temporary stay so that respondent's attorney could seek a permanent stay from the Appellate Division pending appeal. While the court undoubtedly acted in good faith after a fair consideration of the evidence, the instant determination now makes it clear that a stay would have been appropriate. In general, it would seem to be a better policy for Judges of the lower courts to permit the Appellate Division to have the chance to exercise its discretion in cases of this importance. At this juncture, we must now order the petitioner to produce the children in Family Court for the new hearing. Should the petitioner default or not produce the children, the respondent may seek and obtain in the Family Court an order awarding custody to her.

In remanding this matter for a hearing *de novo,* we direct that it be held before another Judge of the Family Court. The hearing court below has already formed strong opinions upon the limited evidence presented to it. Another Judge of the Family Court, with no exposure to the case, should be permitted to consider all issues anew with the assistance of the additional evidence that will hopefully be brought to bear.

For the reasons stated, the order of the Family Court, New York County (DEMBITZ, J.), entered April 23, 1981, which, *inter alia,* awarded custody of the three children to the father with limited visitation rights to the mother, should be reversed, on the law and the facts, and the matter should be remanded for a hearing *de novo* in accordance herewith, before another Judge of the Family Court, without costs. Should the petitioner default at the new hearing or if the children are not produced in court, then the respondent may apply in Family Court for an order awarding her custody.

MURPHY, P. J., MARKEWICH, LUPIANO, BLOOM and FEIN, JJ., concur.

Order, Family Court, New York County, entered on April 23, 1981, unanimously reversed, on the law and on the facts, without costs and without disbursements, and the matter remanded for a hearing *de novo* in accordance with the opinion *Per Curiam* filed herein, before another Judge of the Family Court.