Alan G., Respondent-Appellant, v Joan G., Appellant-Respondent.

First Department, December 4, 1984

## APPEARANCES OF COUNSEL

*Herman H. Tarnow* for appellant-respondent.

*Jerome M. Leitner* of counsel (*Kimmelman, Sexter & Sobel,* attorneys), for respondent-appellant.

### OPINION OF THE COURT

*Per Curiam.*

Once again we are called upon to review the appropriateness of a nisi prius determination that changes the custody of young children in a bitterly contested matrimonial action. Defendant-appellant, the mother of the children, argues that by granting

custody to the plaintiff-respondent father, the court improvidently interrupted long-standing custody arrangements, in derogation of the best interests of the children, and did so through the application of an improper standard and upon an insubstantial factual underpinning. She argues further that in directing equitable distribution of the parties' marital property, the court failed to set forth its reasons, as required by section 236 (part B, subd 5, par g) of the Domestic Relations Law. The plaintiff-respondent husband cross-appeals, citing as error, the trial court's failure to award child support to him as a concomitant of the custody award. He also assigns as error, the court's grant of exclusive possession of the marital residence to the defendant, the failure to order an immediate sale of the marital residence and the parties' summer home and the court's failure to equitably distribute the parties' marital personal property.

The parties were married on December 31, 1975, and have two children, Eric and Laura. Eric is now six years of age and will celebrate his seventh birthday on January 30, next. Laura attained age five on October 22, last past. Until September, 1981, the parties maintained their primary marital residence on East 79th Street in Manhattan. They also own a vacation home in East Hampton, Long Island. The marriage was marked by discord and controversy from the very beginning, with each party contributing substantially thereto. That discord and controversy focused, in September of 1981, *inter alia,* upon issues respecting the maintenance of the vacation home in East Hampton, the desirability of selling it and the disposition of the proceeds of such a sale, and whether or not the wife would participate in the ownership of certain real estate the husband was buying for his business. Following an argument on or about September 18, the husband declared that the marriage was over and walked out of the East 79th Street apartment. He proceeded to East Hampton where he removed a considerable amount of the furniture, fixtures and personal property from the vacation house. At the same time the wife changed to her name alone, the authorization for access to a safe-deposit box in which her jewelry had been placed, revoking the authorization for access by a corporation of which she and the husband were officers. The wife had new locks installed on the door of the East 79th Street residence, but as a result of the husband's threats as to what would happen if he were locked out, they were not used until this action was commenced. Thus, on the day that process was served, the husband found himself locked out of the apartment and proceeded to break open the locks and the door with a sledge hammer.

He later removed more of his personal belongings from the apartment and ceased to reside there. He continued to have access to the children however and visited with them regularly until sometime in December, when the wife is alleged to have withheld visitation as a consequence of a dispute over the amount of child support the husband was voluntarily providing. From that point forward, the record reflects continuing conflict and acrimony between the parties concerning custody of and visitation with the children. The wife's alleged withholding of visitation precipitated the commencement of a habeas corpus proceeding by the husband. That proceeding was withdrawn when the court secured a stipulation between the parties, implicitly giving temporary custody to the wife and providing a schedule for regular visitation by the husband.

Despite the stipulated visitation provisions, the controversy over visitation continued, with the husband claiming interference by the wife and physical abuse by members of her family. His application for temporary custody was essentially denied and an order was entered embracing the visitation provisions of the prior stipulation. Temporary custody of the children was formally given to the wife. Thereafter, mutual orders of protection were issued and a psychiatric evaluation of the parties and the children was ordered.

In the summer of 1983, the husband requested an expanded summer visitation schedule with the children beyond that provided for in the 1982 court order. That application was also denied in that the court directed that the 1982 order be adhered to and that the husband's summer visitation be limited to the two weeks provided for in that prior order. Apparently miffed by this decision, the husband wrote a letter to the Judge chastizing the court for its decision. He declared that he was relinquishing his claims to custody of the children. He quickly changed his mind, however, and requested the resumption of visitation with the children, which he obtained. He flew to East Hampton to pick them up from their mother, and kept them with him over the weekend. On Sunday evening, he purported to return the children to the East 79th Street apartment, in compliance with the "literal" language of the court order, although to his knowledge, the wife was then still in East Hampton.

The trial commenced in late July. Considerable evidence was received concerning the medical and psychiatric history of both the husband and wife and psychiatric consultations with the children, especially Eric. A Dr. Bernard L. New, a psychiatrist, testified extensively. He had initially been consulted by the wife

in December of 1981, in respect to concerns she had arising from perceived problems and negative reactions the children allegedly were having following their visitation with their father. Although the wife had initially consulted Dr. New, she did not continue her consultation after the husband became involved. The husband maintained his contact with Dr. New, however, either seeing him or talking to him by phone a number of times. Dr. New also saw Eric on a number of occasions. Dr. New indicated that it was his opinion that the father had demonstrated a capacity to provide a stable parental overseeing of the children. He told the court that following a particular traumatic and upsetting episode when he saw Eric a couple of times he "thought it would be preferable to have Eric be with his father for that time." He testified further, however, that he did not have sufficient information to form an opinion concerning the wife's capacity to provide a stable parental overseeing of the children; that because he had not seen the wife during the year past, he had not been able to observe her in order to determine her capacity for stability. Nor could he offer an opinion as to which parent would provide greater long-range stability for these young children.

The wife's expert, Dr. Frederick Brown, a psychologist, testified to a battery of diagnostic tests he performed on the wife. These tests are designed to "evaluate the individual, to assess the person's integration, manner of functioning, level of intellectual and emotional cohesiveness and efficiency, and in general to make a comprehensive evaluation of the person and that person's functioning in all areas, whether vocational, interpersonal, parental or whatever efficiency of functioning is at issue." Dr. Brown concluded, on the basis of these tests, that the wife was essentially a normal person, devoid of psychopathological stigmata and that she meets "parenting" requirements most adequately. Dr. Brown testified that a patient's history is of "secondary importance" and that although knowledge of the wife's past history of encephalitis with epileptic sequillae would be important, since the tests he had administered to the wife came through in a fairly benign fashion, he concluded that the condition described, even though not known about, had little or no impact upon the wife's intellectual functioning nor was there any indication that the affliction had an impairing effect upon her personality organization. Moreover, a subsequently administered electroencephalogram was normal and showed no residual effects of the wife's illness. Despite this evidence and Dr. Brown's uncontradicted testimony, the court dismissed the doctor's findings and his opinion holding them not to be of any

probative force because the doctor did not know of the wife's past history.

Following the conclusion of the trial, but prior to the court rendering its decision, a crisis arose regarding Eric's reaction to a dispute between the husband and wife. It appears that there was an outstanding bill due to the private school Eric had been attending, the obligation for the payment of which was disputed between the parents. Consequently, Eric was not to be returned to the private school, but would be enrolled in Public School No. 6. He became extremely upset by these events and threatened bodily harm to his mother and suicide. Upon the father's application for psychiatric intervention, the court directed that Eric be seen by Dr. New who was then to furnish a report to the court regarding the need for treatment. This referral to Dr. New was objected to by the wife's attorney because of Dr. New's apparent partiality as evidenced by the fact that he had testified as a witness for the husband at the trial.

Nevertheless, Dr. New consulted with Eric and reported to the court that it was his impression that the father "has demonstrated a greater degree of stability of his perspective which seems to better meet the needs of the child." Although he conceded that he was operating on inadequate information, the doctor nevertheless expressed the opinion that "at the present time Eric is probably better off staying with his father, the father as the primary custodial parent". This opinion contrasted with Dr. New's trial testimony, where he had conceded that he didn't have sufficient information to form an opinion as to "which parent would provide greater long term stability for these young children." He had testified at trial, that while he had had a number of contacts with Eric and the father during the two years of the litigation, he had not seen the wife in over a year and, therefore, he could not make a determination as to her stability. There is no indication that Dr. New had seen the wife since the trial or consulted with her or obtained any information concerning her, other than that told to him by Eric and the husband. Thus, as the doctor conceded at the hearing, he was still operating on inadequate information and based his conclusion primarily upon what he perceived to be Eric's desire to be with his father.

The court thereafter granted mutual divorces to the parties, granted custody of the two infant children to the father and granted exclusive possession of the marital residence to the wife, with directions for its future sale and division of the proceeds.

The court also granted joint use and occupancy (alternating) of the vacation home in East Hampton, with directions for its future sale and division of the proceeds. The court provided for visitation by the wife, denied alimony to her, directed support of the children by the husband and determined the separate property of the parties. Other decretal paragraphs addressing matters not here pertinent were contained in the judgment. The court, in its findings of fact, determined that there was no marital property to be equitably distributed other than the marital residence and the vacation home. Although provisions for the distribution of these properties were made, the court did not indicate the statutory facts it considered in reaching its determination.

This court subsequently stayed the enforcement of the custody provisions of that judgment, pending this appeal. We now reverse the judgment as to custody and remand the case to the Supreme Court for further proceedings not inconsistent herewith.

It is the clear and unquestionable public policy of this State that as between two natural parents, custody is to be determined solely by what is in the best interests of the child. (*Friederwitzer v Friederwitzer,* 55 NY2d 89; *Matter of Nehra v Uhlar,* 43 NY2d 242; *Martin v Martin,* 74 AD2d 419.) Neither parent has a prima facie right to custody (Domestic Relations Law, §§ 70, 240) and "[t]he only absolute in the law governing custody of children is that there are no absolutes". (*Friederwitzer v Friederwitzer,* 55 NY2d 89, 93, *supra.*) Thus, any consideration of a so-called tradition of "momism", either as a basis for awarding or denying custody of minor children is wholly irrelevant and misplaced. And while it is frequently said that the question of custody is a matter of discretion for the hearing court (*Matter of Ebert v Ebert,* 38 NY2d 700, 703; *Labow v Labow,* 86 AD2d 336, 341) and its determination is rarely upset by an appellate court, the hearing court's discretion is not absolute and it may be set aside where it lacks a sound and substantial evidentiary basis. (*Matter of Darlene T.,* 28 NY2d 391, 395; *Giraldo v Giraldo,* 85 AD2d 164, 171.) Indeed "[a]n appellate court would be seriously remiss if, simply in deference to the finding of a Trial Judge, it allowed a custody determination to stand where it lacks a sound and substantial basis in the record and, indeed, is contrary to the weight of the credible evidence (cf. *Matter of Darlene T.,* 28 NY2d 391, 395)" (*Matter of Gloria S. v Richard B.,* 80 AD2d 72, 76).

Although there are no absolutes in the law governing custody of children (*Friederwitzer v Friederwitzer, supra*), there are

factors that are entitled to weighty consideration. Thus, it has been held that "in determining custody, the length of time the present custody has continued is to be considered and that ' "[p]riority, not as an absolute but as a weighty factor, should, in the" * * * "absence of countervailing circumstances on consideration of the totality of circumstances" ' (see *Friederwitzer v Friederwitzer, supra,* pp 94-95), be given to the 'first custody awarded in litigation or by voluntary agreement' (*Matter of Nehra v Uhlar, supra,* p 251)." (*Meirowitz v Meirowitz,* 96 AD2d 1030.) Here, as in *Meirowitz,* "[a]lthough the parties in this case did not have a formal agreement concerning custody of the infant[s], the husband implicitly agreed that the wife should be the custodial parent, when he moved out of the marital residence * * * and left the child[ren] with the wife" (*Meirowitz v Meirowitz, supra,* p 1031). This implicit agreement was confirmed and fortified by the stipulation respecting visitation reached at the time the husband's initial habeas corpus proceeding was settled, which again recognized the wife as the custodial parent. To be considered also is the fact that custody of the children was formally granted to the wife pending trial and the fact that the husband's subsequent applications for a change in custody were each denied. Such factors are by no means determinative of the ultimate issue of the best interests of the children, but are to be given due consideration in determining whether there should be a change in custodial arrangements. Indeed, "[t]he courts should be reluctant to transfer custody of young children who have been with their mother since birth" (*Aberbach v Aberbach,* 33 NY2d 592, 593) and such "custody should be continued unless it is demonstrated that the custodial parent is unfit or perhaps less fit" (*Martin v Martin,* 74 AD2d 419, 426). Not only does it appear that the trial court failed to give due consideration to these factors in determining to order a change in custody, the proof before the court failed to demonstrate the "unfitness" of the wife, in any sense, or that she was "less fit" (*Aberbach v Aberbach,* 33 NY2d 592, *supra*). Indeed, the evidence demonstrates, and the court aptly observed, that both parties were "fit".

■ In granting custody to the father, the court relied to an inordinate degree upon the opinion rendered by Dr. New during the posttrial hearing. Such undue reliance was misplaced. Particularly so, when consideration is had of Dr. New's trial testimony that he was unable then to express a definitive opinion as to which parent would provide greater long-range stability for these young children. He conceded then and again during his posttrial hearing testimony that he was "operating

on inadequate information", that he had not had a chance to talk to the wife recently, and that that was certainly a "part of the picture". He also conceded that he did not know what events led to Eric's threat of suicide nor did he know of or could recall any incidents or instances that would show the wife's instability. The court should have considered more carefully Dr. New's prior involvement in this litigation and the fact that he had appeared as a witness for the husband during the trial; especially since the proposed posttrial examination was to play such an important role in determining the custody issue. (See *Shapiro v Shapiro,* 89 AD2d 538; *Giraldo v Giraldo,* 85 AD2d 164, *supra.*) We would observe, also, that the court apparently overlooked the extensive trial testimony concerning the husband's history of psychiatric problems, his professed "inability to care for himself", as expressed to his doctor a scant two weeks before the commencement of the trial; his failure to abide by court orders respecting support and his resort to self-help in respect to visitation. In the circumstances, the award of custody was tantamount to rewarding him for his misdeeds. (*Labow v Labow,* 86 AD2d 336, affd 59 NY2d 956, *supra.*) As has been said previously, where a trial court relies heavily upon a psychiatric report, prepared without adequate information concerning the mother of young children and based primarily upon a biased and one-sided description given by the father and ignores the significance of the father's personal conduct, the trial court's custody award lacked a sound and substantial basis in the record (*Matter of Gloria S. v Richard B.,* 80 AD2d 72, 76, 77, *supra*) and should not be allowed to stand.

The court declined to direct equitable distribution of the marital property of the parties, beyond directing that the vacation home in East Hampton be shared by the parties until Laura attains age 21, at which time the house is to be sold and the proceeds divided equally between the parties, and providing for the exclusive occupancy of the East 79th Street cooperative apartment by the wife, with the maintenance expenses thereof to be her sole responsibility. As to the latter property, the court also directed that upon Laura attaining age 21, the shares allocated to that apartment were to be sold and the net proceeds, after reimbursement to the husband of his initial investment, divided 85% to the husband and the balance to the wife.

■ The court observed that the bulk of what each party has accumulated or inherited appears to have been owned prior to the marriage and thus is not subject to equitable distribution. However, the court neither made any findings nor set forth the factors it considered and the reasons for its decision, as required

by section 236 (part B, subd 5, par g; subd 6, par b) of the Domestic Relations Law. These requirements of the Domestic Relations Law are "mandatory" and may not be waived by either party. "An insufficient explanation for the court's findings and determination requires reversal of the judgment and remand for further consideration" (*Wilson v Wilson,* 101 AD2d 536, 538). To the extent the court relied upon *Duffy v Duffy* (94 AD2d 711) and *Kobylack v Kobylack* (96 AD2d 831) as authority upon which to justify noncompliance with the statutory mandate, such reliance is in error.

In *Duffy* (*supra*), the court made clear that the provisions of section 236 (part B, subd 5, par g) are mandatory and are "intended to restrict judicial discretion and also to provide a clearer record for an appeal" (*Duffy v Duffy, supra,* p 712). Because the lower court's reasoning was set forth in detail, however, the Appellate Division undertook to modify certain portions of the judgment to conform with the over-all circumstances of the parties as revealed by the record. The court noted, however, that its "decision must be read as limited to the special circumstances existing in the instant matter (cf. *Nielsen v Nielsen,* 91 AD2d 1016)" (*Duffy v Duffy, supra,* p 712). So, too, in *Kobylack v Kobylack* (96 AD2d 831, *supra*) the Appellate Division, Second Department, specifically found that the lower court "set forth the factors enumerated in the Domestic Relations Law (§ 236, part B, subd 5, par d, cls [1]-[10]), and the facts relevant thereto, which it considered in arriving at the formula for the distribution of the marital property".

By contrast, we have held that "[a]n insufficient explanation for the court's findings and determination requires reversal of the judgment and remand for further consideration" (*Wilson v Wilson,* 101 AD2d 536, 538). In *Levine v Levine* (102 AD2d 799), we remanded the case to the trial court to make the "specific findings with respect to the 10 factors enumerated in section 236 (part B, subd 5, par d), consideration of which 'may not be waived by either party or counsel' ".

Accordingly, the judgment appealed from should be modified, on the law, on the facts and in the exercise of discretion, to the extent of reversing the grant of custody of the infant children to the husband plaintiff, awarding custody of said children to the defendant mother, and remanding the matter to Trial Term, New York County, for findings with respect to the equitable distribution of marital property as required by section 236 (part B, subd 5, par d) of the Domestic Relations Law and the judgment otherwise affirmed, without costs.

SANDLER, J. P., ROSS, CARRO, SILVERMAN and ALEXANDER, JJ., concur.

Judgment, Supreme Court, New York County, entered on or about December 22, 1983, unanimously modified, on the law and the facts, and in the exercise of discretion, to the extent of reversing the grant of custody of the infant children to the husband plaintiff, awarding custody of said children to the defendant mother, and remanding the matter to Trial Term, New York County, for findings with respect to the equitable distribution of marital property as required by section 236 (part B, subd 5, par d) of the Domestic Relations Law, and the judgment is otherwise affirmed, without costs and without disbursements.