Matter of W. v J. (2005 NY Slip Op 51061(U))

[*1]

Matter of W. v J.

2005 NY Slip Op 51061(U)

Decided on May 31, 2005

Family Court, New York County

Jurow, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 31, 2005

Family Court, New York County
Matter of W. J.
xx-xxx

George L. Jurow, J.
In this highly contested custody dispute, each parent seeks custody of the subject child, born December 7th, 2000. The parties have been litigating custody and visitation issues over the past four or five years, that is, virtually from the child's birth. Eventually, a forensic evaluation was ordered and upon completion of the forensic evaluation the matter went to trial. The trial was lengthy, consuming approximately ten or eleven days, many witnesses were called, and numerous exhibits were introduced in evidence.
After considering the entire record, the Court finds that the record, by more than a preponderance of the credible evidence, supports an award of both legal and primary residential custody to the father, with a specific type of access or visitation schedule granted to the mother. This decision and conclusions are also consistent with the findings and recommendations of both the forensic evaluator and the child's law guardian.
What follows is an assessment of the evidentiary record, including the forensic evaluations, a summary of the essential elements of the in-court testimony, and an analysis of the full evidentiary record as it relates to the Court's conclusions.
By way of a brief historical predicate, the parties, the parents, are both physicians. Dr. J., the mother, is a pain management specialist. The father, Dr. W., is a urologist. The parents met in 1996 and eventually began a romantic relationship. During this relationship there were various discussions of marriage, but that never occurred. There is a good deal of material in the record about the marital discussions and the parties' intent concerning marriage, but what appears to be the case is that the father had significant reservations about marriage, although the mother kept pressing the issue.
For whatever reasons, despite their nonmarital status, the parties chose to have a child. The record is clear, as will be noted further below, that the mother was extremely angry at the father for ultimately not marrying her. In fact, as early as a court appearance on December 17th, 2001, the mother without hesitation vented her anger at the father in court, primarily because she felt he had "used her as a vehicle," rather than entering into a long-term marital relationship. The record clearly indicates that the mother's initial rage, centering on the marital issue, but apparently exacerbated by other variables, has continued unabated to this day.
Soon after the child's birth, the father became concerned about and complained of behavior by the mother that was intended to or had the effect of restricting his access to the child. [*2]Numerous court appearances occurred, centering on the issue of obstructionist behavior by the mother and the father's attempts to gain adequate access.
During a period in which this Court was away, a covering judge, Judge Susan Knipps, after hearing about one of these alleged obstructionist episodes by the mother, gave the father temporary legal custody in July of 2002, and that interim order has remained in effect to this day. The current arrangement is that the child spends two-week periods with the father, then a week with the mother, and then resumes two weeks with the father. It is the appropriateness of this arrangement, and who should be the primary legal and physical custodian, that was the focus of the litigation.
The Court appointed Dr. Stephen Herman, a psychiatrist, to conduct the forensic evaluation. He was qualified as an expert in psychiatry and forensic child custody evaluation. Initially, I will summarize Dr. Herman's evaluation. It is important to note that the evaluation process contained some unusual complexity in that Dr. Herman conducted two evaluations, the second being a "supplementary evaluation," and thus submitted two evaluation reports to the Court. The first evaluation report was dated August 27th, 2003, and the second supplementary or updated forensic evaluation report was dated March 8th, 2004. Both reports are, of course, in evidence and were supplemented by extensive in-court testimony, both direct and cross of Dr. Herman.
In his first report, Dr. Herman summarized the relationship between the parties and noted the marital issue dispute, that is, that the father was unenthusiastic about marriage but that the mother was promoting and pushing for a marital relationship. Dr. Herman concluded, after multiple interviewing, etc., that the child has a deep connection with both of her parents and that the child appears to be in good psychological health. He noted the mother's chronic anger at the father. He believed that although much of her anger may have been initially justified, the way in which she has expressed it over time has caused harm to the child. In particular, Dr. Herman noted numerous critical communications (such as e-mails) filled with criticisms of the father's parenting. And, perhaps more important, Dr. Herman noted that the mother has raised what he called the "nuclear bomb" of sexual misconduct.
Dr. Herman noted that although he did not conduct a formal sexual abuse evaluation, he stated that there was no evidence, based upon seeing the child and the father, that there was any molestation. He stated that it was important that the mother get rid of her idea that the father may have sexually molested the child.
Dr. Herman further noted in his report what he called two "boundary" problems related to the father. One concerned the act of the father, when present in the delivery room during the birth of the child, of inserting a urinary catheter inside of the mother, in order to relieve her of severe pain she was experiencing. Dr. Herman characterized this as an act of urological control, rather than a humanitarian gesture. The second boundary issue he noted concerned the father changing the child's diaper in his (empty) waiting room.
[*3]
With respect to the mother, Dr. Herman in his conclusions noted a serious concern with the mother's therapist, whom he had contacted and whom he believed was "fueling" the mother's allegations against the father. He suggested that the mother obtain a new therapist in order to help her "move on and let go of her insinuations about Dr. W. being a molester."
Ultimately, Dr. Herman recommended in his first report that the mother be the primary custodian and that the father receive extensive visitation. (The two so-called "boundary" episodes involving the father appeared to play a role in the custody recommendations.) However, in what was perhaps a warning to the mother at the end of his report, Dr. Herman stated, "Dr. J. should know that if she impedes this child's access to her father, she does great harm to her child, returns this matter to court, wastes more money and could ultimately lead to her losing custody."
Following completion of Dr. Herman's first forensic report and distribution of the report to counsel and the parties, at a later court proceeding the law guardian asked the Court to direct Dr. Herman to reopen his forensic evaluation and provide a supplementary report. The basis for the law guardian's request was that the law guardian had received various written communications from the mother that she believed were of significant concern regarding the propriety of the mother's behavior and judgment. She asked that this material, which she believed indicated continued and serious obstructionist behavior by the mother, etc., be provided to Dr. Herman and that Dr. Herman consider it and provide a supplementary forensic report.
By order of this Court, Dr. Herman conducted further interviews of the parties and considered the various additional written materials that alarmed the law guardian and, on March 8th, 2004, provided a supplementary report, which will be referred to as the second forensic evaluation. In this second report, Dr. Herman noted that the mother was continuing to complain of various behaviors by the child that she considered "sexualized behavior," that she also complained that the child was experiencing nightmares while at her residence, and that she recorded these alleged nightmares.
In his additional sessions with the mother. Dr. Herman noted that her negativism concerning the father and his parenting capacity was much worse, that is, more negative, than it had been at the time of the first evaluation. Dr. Herman noted that the mother has continued to believe that something sexually inappropriate was going on at the father's house and has no confidence in him as a parent. And, as well, the mother wants to further restrict; the father's access time with his daughter. In sum, Dr. Herman concluded that there has been "no movement away from Dr. J.'s belief that this child is in danger, particularly regarding some inappropriate sexual misconduct when she's with her father."
In further assessing the interaction between each parent and the child, Dr. Herman concluded that the mother was more rigid and that her overall style was much less easygoing than that of the father. He again said that the child appears to be normal and showed no evidence of any kind of trauma. In his conclusions, Dr. Herman emphasized that the sexual innuendos by the mother continue and show no sign of abating. He believed that the mother is suffering from "a [*4]fixed, apparently permanent" idea that the child is being exposed to sexual inappropriateness when with her father, who she believes is an incapable parent.
Dr. Herman noted the disconnect between the mother's allegations and his observations that the child and the father have a "wonderful, comfortable relationship with each other." Dr. Herman noted evidence of poor judgment by the mother, including her insistence on seeing the child at school during the time when the child was in the physical custody of the father.
Dr. Herman then stated that he is reversing his earlier position (in his first report) and is now recommending that the father have sole custody of the child. He stated, "I'm concerned that with the large, continuous amount of time that [the child] would spend with her mother and with her mother reinforcing the idea that the child is not safe with her 'inadequate' father, [the child] will grow up confused and will eventually develop psychiatric symptoms, caused by the mother. One way of preventing this would be to have the more rational parent be the primary parent. In my opinion, that would be Dr. W."
Dr. Herman added that he has grave concerns about the mother's psychological stability, and again suggested that she obtain a new therapist who can deal with her problems, rather than reinforcing her misconceptions. He recommended that the risks to the child's emotional well-being by the exposure to the mother's fixed negative beliefs about the father supports his proposal to limit the child's time with the mother to less than fifty percent.
Dr. Herman supplemented and further explicated his evaluation reports by his in-court testimony. Much of his testimony, particularly his direct testimony, repeats material in the forensic reports and will not be further detailed, except for the following: He emphasized, in his direct testimony, that the mother puts her needs above those of the child and will continue to impede the child's access to her father. Conversely, the father is the more cooperative and less angry parent, and will better foster the child's access to her mother. Also, the additional material reviewed by Dr. Herman, that is, written communications provided by the mother to the law guardian and others (which are exhibits in evidence), indicated to Dr. Herman a chronic pattern of the mother "trashing" the father. He emphasized that her belief system was extremely fixed and unalterable and was not likely to change. He noted that clinically the problem as it relates to the child by the mother bad-mouthing the father, whom the child loves, either already creates or will lead to emotional confusion by the child, and risks, as the child ages, symptomatic difficulties, such as anxiety, anger and physical symptomatology.
Dr. Herman was cross-examined at great length by Timothy Tippins. Mr. Tippins asked numerous questions as to whether Dr. Herman followed various forensic "practice parameters," one set of which Dr. Herman co-authored. Dr. Herman, in turn, defended his methodology. Dr. Herman did concede that one omission on his part was that he did not interview the child separately. Despite repeated questioning by Mr. Tippins concerning the scientific underpinnings of forensic evaluations in general and Dr. Herman's specific evaluation in this case, Dr. Herman emphasized that he saw his role as assisting the Court in making decisions based upon the [*5]clinical observations that he made, and that he believed that the data derived from his observations were sufficient to support his conclusions and recommendations, notwithstanding the fact that clinicians in general cannot with certainty predict future outcomes for a particular child.
The father testified at length. He testified to the obstacles the mother placed immediately after birth, and later on a continuous basis, to his access with his child. He noted that the mother said to him from the beginning that because he failed to marry her he had no rights, legal or otherwise, to see the child. He said that he was not able to get sufficient access without court proceedings, and he provided numerous examples of the mother's obstruction.
With respect to the "catheter" incident, he testified that the mother asked him, because of her severe pain and the fact that there were no other physicians available, to put the catheter in to relieve her discomfort, and that he did so with the nurse's approval.
The father summarized the factual circumstances that led to the temporary order of custody granted to him by Judge Knipps. (This episode involved the mother, without discussion with the father, obtaining a vacation residence that had the effect of curtailing or making it virtually impossible for the father to have his court-ordered visitation). The father noted that he observed no sexualized play by the child, as alleged by the mother, and although the mother claimed the child had "nightmares while at her home," he did not observe any such thing when the child was with him.
The father was disturbed by the behavior of the mother in bringing a videocamera to the child's ballet classes (when the father had physical custody and was bringing the child to the classes). He found this behavior disruptive, odd, and an interference with his parenting time.
The father's sister, who is an attorney in Los Angeles, testified that she came to New York to see the child, but experienced similar resistance by the mother to letting her (as well as the father) see the infant.
The mother, as did the father, testified at great length. She testified as to how she had arranged the child's activities, playdates, etc. She testified that the child frequently would wake up screaming in the middle of the night, and that these "nightmares" persisted for some period of time, although they have more recently lessened. She stated that she recorded many of these nightmares. The sexualized behavior that she said concerned her involved the child touching her crotch, pushing her shirt open, trying to kiss her breast, and licking a bathtub plunger.
She denied actually stating that the father was molesting the child, although she communicated these concerns to other persons, including her attorneys. She essentially denied obstructing access to the child by the father or his family. She acknowledged making a "mistake" when she rented the Westhampton house, which had the effect of interfering with the father's visits. She stated that the reason that she videotaped the child's ballet classes was that she did not [*6]like Dr. Herman suggesting that the child preferred the father, and she wanted to prove that the child during these classes would run to her more often rather than to the father.
With respect to the "catheter" episode, the mother acknowledged that in an affidavit she stated that a nurse directed or ordered the father to insert the catheter, although she proffered in her testimony another version in which, although she was screaming in pain, the father on his own inserted the catheter. (All in all, the mother, over time, provided three different versions of this episode.)
At one point, the mother complained that when she spoke to the child by phone (when the child was with the father), she did not like the father hovering in the background "monitoring" the calls "like in the Soviet Union, not America."
The mother's housekeeper testified that on several occasions she saw the child lick the mother's face.
The law guardian's social worker, Susan Greenberg, testified. She was qualified as an expert in clinical social work and in child custody. She conducted a series of observations of the child with her parents and did other investigatory work. She described the child's interaction with the father as very good. She found the father and child to be at ease and reciprocally appropriate in their relationship. She noted that the interaction between the child and the mother was somewhat different. In particular, the mother tried to get the child to do things that she, the mother, wanted, rather than responding to the child's wishes. The interaction, according to Ms. Greenberg, had a "staged" quality. The mother repeated to Ms. Greenberg that the father was not a good parent. The mother told Ms. Greenberg that some of the information as to what goes on at the father's home, in terms of how much time the child spends with her father and what activities take place, etc., came from the child (a claim Ms. Greenberg found odd).
In summary, in her testimony Ms. Greenberg emphasized the clear anger and hostility toward the father expressed by the mother, and that the child was far more relaxed and at ease in her interaction with the father. That is, Ms. Greenberg said that when with the father the child reacted to the father's cues, but when with the mother the mother directed the activities.
Ms. Greenberg recommended that the father be given custody because the mother would obstruct access because of her anger at the father. She described the mother as focusing too much on her own needs and concluded that the father was the more nurturing of the two parents.
Finally, Dr. David Martindale, a forensic psychologist, testified on behalf of the mother. He was qualified as an expert in clinical psychology, forensic psychology, with a focus on child custody evaluations and so-called "peer review." He reviewed Dr. Herman's forensic reports and a transcript of his trial testimony.
The doctor noted that there have been various custody evaluation protocols issued by a [*7]variety of organizations, such as the American Psychological Association, the American Psychiatric Association, the Academy of Child and Adolescent Psychiatry, and others. He noted that there are common elements to these protocols. In particular, they emphasize that the clinical evaluator should rely on "multiple sources of data" and should not rely too strongly on any one source of information. He characterized this as, in effect, obtaining so-called "convergent validity."
Dr. Martindale expressed his view that Dr. Herman was not relying on a particular knowledge base, but rather was expressing his personal opinions. He noted an aspect of Dr. Herman's testimony in which Dr. Herman said he was not relying on "science." Dr. Martindale stated that he believed that unstructured clinical interviews have low reliability and that it would have been better had Dr. Herman used "structured interviews."
He noted that the mother seemed to be expressing reasonable concerns to Dr. Herman and that Dr. Herman was using stronger terms to describe these concerns, that were the equivalent of claiming that the mother was delusional.
The doctor stated that Dr. Herman, among other things, should have seen the child in her home, rather than in his office. Also, the doctor noted Dr. Herman's concession that he made an omission by not separately interviewing the child.
The doctor suggested that exposure to movies or television might be a variable with respect to the child's bad dreams or nightmares.
On cross-examination, the doctor conceded that he did not the interview the mother, the father, or the child. The doctor also conceded that he did not have access to the written material (such as the mother's complaint letters concerning the father) that Dr. Herman had, so Dr. Martindale did not know what role the collateral documents may have played in Dr. Herman's evaluation.
Dr. Martindale also acknowledged that he was not an expert in child sexual abuse evaluation, and was not aware that Dr. Herman had, in his professional career, conducted dozens of child sexual abuse evaluations including custody cases in which sexual abuse was an issue.
Dr. Martindale also conceded that it is appropriate for a forensic examiner to focus on the denigration of one parent by the other.
Finally, Dr. Martindale conceded that a competent forensic examiner might choose to decline to interview a three-year-old child on reliability and/or validity grounds.
At the end of his testimony, Dr. Martindale noted that clinical interviewing or much of the forensic evaluation process is not "science" (in that controlled experiments cannot be done in this area) but that there is a type of scientific methodology that exists. He concluded by stating [*8]that his basic critique of Dr. Herman is that he was not cautious enough in drawing his conclusions.
In addition to the above, numerous exhibits were introduced in evidence, amongst them were written communications by the mother, as noted above, to various individuals concerning complaints about the father's parenting capacities.
Also, as noted above, the mother introduced two exhibits she considered of particular significance to the custodial issue. These constitute the audiotapes she says she made of the child having nightmares at her home, and the video recordings of the child's ballet classes. She claims that this evidence supports her custodial argument.
The Court has carefully reviewed (played) these exhibits. To the contrary, if anything, these exhibits are very disturbing to the court and raise questions concerning, rather than support, the mother's custodial claims. The audiotapes clearly indicate that the mother, over a substantial period of time, placed a microphone right next to the child. Much of the noise on these tapes appears not to constitute nightmares, but rather fairly typical crying, groaning or noises that a child might make when woken up. It is not possible to interpret any of these tapes as containing anything like serious nightmares.
More troubling, it appears that the child, possibly on multiple occasions, was waking up because of the mother's monitoring and interventions during the child's sleep.
The videotapes of the ballet classes reinforce the court's concern. The mother proffered these tapes to demonstrate the child's "preference" for her. The tapes do no such thing. Rather, they show a mother placing herself and a video recorder directly in the line of sight of a child who is taking a dance class. At times, when there is a break in the class or the class ends, the child runs or walks in the direction of either parent. There is no particular preference expressed.
In addition, it is also evident from the video recording that the camera held by the mother directly in the line of sight of the child constituted a distraction to this child. There is a significant question concerning the mother's judgment in terms of her belief that this type of intrusive behavior would prove anything other than the fact that the mother does not seem able to control her emotions and exercise some restraint in trying to continually denigrate the father at the child's expense.
In sum, the mother disrupted the child's sleep, and dance classes, for her own purposes.
In analyzing the evidentiary record, the Court had the unique ability to observe the in-court testimony of the numerous witnesses. As such, the Court observed the demeanor of the witnesses, the manner in which they testified, the substance and tone of their testimony, and was able to arrive at an overall basic assessment of the credibility of the various witnesses.
[*9]
There was a striking and stark contrast between the in-court presentations of the father and the mother. I found the father to be warm, empathic, even-tempered, calm and clearly attuned to the needs of the child. In addition, although clearly not happy about the history of the mother's access obstruction, he understood it as a problem that had to be dealt with or worked through over time. His testimony was candid, rational and appropriate. Overall, I found him to be a highly credible witness, and to the extent that his testimony about various factual matters or episodes differs from those of the mother, I credit his version.
In contrast, the striking aspect of the mother's testimony was her anger. This anger was always present. At best, the anger was seething and barely suppressed, and at other times it was openly and visibly expressed in the form of rage reactions. Her testimonial tone was frequently scornful. This in-court presentation by the mother is a very serious concern to the Court, because it is so consistent with the findings of the forensic examiner, the law guardian's social worker, and others.
At times, her testimony was significantly lacking in credibility, e.g., she gave at least three different versions of the "catheter" episode. Her depictions of the alleged sexualized behavior by the subject child were presented in a forced and somewhat contrived manner. Overall, I found her lacking in credibility and either intentionally distorting events or, if sincerely believing them, allowing her perceptions to be colored and influenced by her general rage.
Having said that, there is no doubt that she strongly loves and cares for her child, and I have no reason to doubt that the child has reciprocal feelings.
With respect to Dr. Herman's evaluation, I found his work product, including both of his forensic reports, as well as his in-court testimony, to have been clinically appropriate, the product of satisfactory methodology, and the conclusions to be fundamentally sound (except for one significant matter related to the first report, discussed below).
The complexities in this particular case with respect to the forensic evaluations relate to the fact that Dr. Herman changed his ultimate custodial recommendation between his first evaluation and his updated second evaluation. This change, of course, is not common to the forensic evaluation process. Nor is it, however, necessarily odd or inappropriate. Rather, the question is, what was the basis for the change in conclusion, and was the basis for the change supported by appropriate and clinically reasonable data? In this case, the answer is that the change in recommendation was clearly reasonable and supportable.
Essentially, the first evaluation showed that both parents cared very much for the child and have a very good, bonded relationship with the child. The custodial recommendation in the first report appeared to be based on what Dr. Herman described as the two noted "boundary" issues related to the father. One had to do with changing a diaper in his waiting rooming, and the other had to do with the "catheter" episode.
[*10]
In actuality, the boundary problems, in the Court's view, did not necessarily form a basis for preferring the mother as the custodian. For one thing, the "catheter" problem was satisfactorily explained in other parts of the record. It appeared that the father was acting, not for his own private purposes, but rather either at the direction of nursing staff, or in response to the absence of medical staff and consistent with the wishes of the mother to have her severe pain relieved. (Dr. Herman may not have known this.) The other issue, of changing a diaper in an empty waiting room, I do not find to constitute a boundary problem, although apparently Dr. Herman did. In this sense, I am critical of and disagree with one of the underpinnings of Dr. Herman's recommendation in his first report.
In any event, the first forensic report presented a close call, in and of itself, in terms of who would be the better custodian. What struck me as more significant in the first report was Dr. Herman's references to the mother's fixed view of the father as a bad parent and her chronic anger at him. Although the first report concluded with a preference for the mother as custodian, it turns out that the first report foreshadowed what happened with respect to the second report. As noted, the second report occurred because of continued critical communications by the mother with respect to the father that so disturbed the law guardian that she asked for additional forensic investigation, and so Dr. Herman provided his second report.
I found that Dr. Herman's reversal of his recommendation in his second report was based upon sound data and reasoning. He emphasized that although he had hoped that the mother's anger towards the father and her portrayal of him as a molester (or to the extent that she denied actually calling him a molester, certainly her chronic innuendos that he was) would abate, his later evaluation of her confirmed the fact that not only did she not temper her rage and sexual accusations, but, if anything, increased them. This is the key point that led Dr. Herman to believe that the mother over time was likely to place the child at emotional risk, for the reasons he explained in the report and in his testimony, and that the father presented much less, if any, emotional risk to the child. In sum, the Court found Dr. Herman's ultimate recommendation to be supported by sound clinical data and reasoning.
A particular feature of this case is that Dr. Herman was extensively cross-examined by Timothy Tippins, a prominent critic of forensic methodology. Mr. Tippins's cross-examination focused on two levels of attack. One was a more generalized attack on the "science" of forensic evaluations, that is, whether there is any reliable and valid science that supports forensic evaluations in general. The second level consisted of highly specific critiques of Dr. Herman's methodology in this case.
These types of methodological attacks on forensic evaluators have become more common in recent years, to the degree that it has been recently noted by the First Department. See In re John A. v. Bridget M., 791 NY2d 421: "In this regard, it should be noted that there is an ongoing debate in both the legal community and the mental health profession as to the implications of expert psychological opinion in custody litigation, especially when the opinion is a conclusion as to the ultimate determination as to where to award custody so as to serve the child's best [*11]interests," citing Tippins and others. Id., at 427 (Sullivan, J., concurring). (For a position contrary to that of Tippins, see Dobrish, Mental Health Professional Testimony in Child Custody Cases, NYLJ, 4-12-05, page 4, column 4.)
The Court need not resolve this generalized debate (which is likely to be ongoing for a while) in this particular case. What Mr. Tippins did in this case was to suggest that Dr. Herman did not follow established professional protocols, including one protocol that he collaborated on, and in other ways did not provide a report supported by "science."
This attack in this particular case constitutes overkill. What Dr. Herman primarily did in this case was clinical interviewing. He interviewed the mother, the father, and he observed the interactions of the parents with the subject child. He also reviewed written communications by the parties, in particular the mother's e-mails and letters. The clinical data he provided was based on these interviews and document reviews.
Unless the courts in New York are prepared at this point, on methodological grounds, or as an interpretation of Frye v. United States, 293 F. 1013 (D.C. Cir., 1923); or Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993); or Kumho Tire Co. v.. Carmichael, 526 U.S. 137 (1999), to throw out or exclude clinical interviewing by a qualified and experienced forensic psychiatrist, something that would overturn established practice even before Kesseler v. Kesseler, 10 NY2d 445, was decided in 1962, it still remains appropriate, as in this case, for a forensic psychiatrist to proffer data that says that, based on his clinical interviews, that there is chronic irrational anger on the part of one parent that in context creates an emotional risk to the child.
Some of the other criticisms involved in Mr. Tippins's critique of Dr. Herman do not affect his conclusions. For example, he emphasizes that Dr. Herman did not do a separate interview of the subject child, who is three and a half years old. However, Dr. Herman did observe the child interacting at length with both parents. In addition, Dr. Martindale, the mother's clinical witness, conceded that interviewing a three-and-a-half-year-old child was well within the discretion of the examiner, because of obvious reliability and validity problems implicit in interviewing very young children.
Further Mr. Tippins critiques Dr. Herman for not conducting psychological testing, which he believes is a less "subjective" enterprise. However, many forensic examiners do not conduct psychological testing (which often does not relate much to parenting capability), and the enterprise of psychological testing does not do away with the reliability and validity problems that Mr. Tippins thinks are involved in the overall forensic process.
In other words, to the extent that this particular case centers on the exclusionary behavior and distortions and anger of the mother, clinical interviewing without psychological testing is sufficient for an experienced clinician.
Most important, perhaps, in undercutting the import of Mr. Tippins's critique, is a point [*12]made by the mother's own expert, Dr. Martindale. Dr. Martindale testified that all forensic protocols emphasize that the forensic examiner rely upon multiple sources of data in their assessment. Dr. Herman did so. He did clinical interviewing, he examined numerous documents and written communications by the parties, he spoke to the mother's therapist, and contacted the child's school.
But the issue of relying on "multiple sources of data" (or so-called "convergent validity," as clinicians such as Dr. Martindale like to term it) goes beyond that of the forensic examiner, and illustrates the limitations of Mr. Tippins's critique of the forensic process in this case.
Even if various methodological flaws advanced by Mr. Tippins with respect to Dr. Herman were conceded, it is critical to emphasize the oft-stated point that the forensic evaluation is but one variable in the court's assessment of the record. What courts do in custody cases is actually akin to the argument advanced by Dr. Martindale, that is, the court is in the position to assess multiple sources of data in the record and to determine if the evidentiary record has elements that so strongly converge (or corroborate each other, as judges or lawyers might put it), so that the decision reached by the court is based upon substantial evidence.
In this case, the forensic evaluation is of significance but, again, is only one variable. What this Court is looking for in this particular case is whether, among other things, Dr. Herman's findings are consistent with other aspects of the record. And it so happens that there is strong consistency between Dr. Herman's clinical findings and other parts of the record.
For example, not only did the law guardian's clinical social worker observe the same clinical data as did Dr. Herman, but the Court also, in observing the in-court testimony and behavior of the parents, found their presentations to be completely consistent with the clinicians who observed them in other settings.
To the extent that Mr. Tippins's critique has an underlying assumption that Courts too readily accept the findings or conclusions of forensic examiners, this Court wants to make it crystal clear that it never has and never will "rubber-stamp" the conclusions of any expert witness. See Bridget M., supra, at 429.
Again, at the risk of being repetitious, I am less concerned with Dr. Herman's ultimate custodial recommendation (that the father have custody) than I am in utilizing his underlying clinical data (e.g., the mother's rage, her exclusionary attitudes, the potential effect on the child, etc.). Thus, in this case, the forensic expert, in Justice Sullivan's words, did "offer guidance and inform," but the "ultimate determination" is a "judicial function," that is, mine and mine alone. Bridget M., supra, at 427.
In sum, the evidentiary record supports findings by this Court that the mother has engaged in and is likely to continue to engage in an unrelenting pattern of trying to exclude the father from the child's life. Conversely, the father is significantly less angry at the mother, is [*13]emotionally more temperate, has good perspective concerning the child's interests and the issues concerning the mother, and over time will provide an emotional climate that is far more suitable for the child than that of the mother.
With respect to the applicable law governing this type of case, the ultimate standard, of course, is the best interests of the child. Friederwitzer v. Friederwitzer, 55 NY2d 89; Eshbach v. Eshbach, 56 NY2d 167; Alan G. v. Joan G., 104 AD2d 147; see also, DRL Sections 70 and 240. As further explained in the above cases and in numerous subsequent cases, factors that must be considered within the best interests standard include: the quality of the home environment and the parental guidance the custodial parent provides for the child; stability; the child's preference, if applicable; the empathy, attachment, judgment and flexibility that a parent behaviorally exhibits with respect to the child; and the ability of the parent to promote a satisfactory relationship with the noncustodial parent.
Beginning with Bliss v. Ach, 56 NY2d 995, a long line of cases has further detailed the latter variable that relates to best interests, namely, the effect that an award of custody to one parent might have on the child's relationship with the other parent. See, e.g., Lohmiller v. Lohmiller, 140 AD2d 496; O'Connor v. O'Connor, 146 2d 909, 910. This line of cases focuses on the obstruction of visitation or access by one parent, often characterized by anger and hostility by that parent towards the other.
In serious cases, custody determinations may be significantly affected by this variable. See Janecka v. Franklin, 150 AD2d 755, 757 (" . . . [P]laintiff mother's 'unbridled' anger and hostility toward the defendant and his family rendered her less fit as the custodial parent . . . .") See also Young v. Young, 212 AD2d 114, 120-122.
In this case, the mother's chronic rage at the father, as exhibited consistently in the trial record, is a variable that must be seriously considered by the Court in determining who is the more suitable custodian. Although it is true that the child is bonded to both parents, and both parents love and care for the child very much, the father's emotional stability, in particular his appropriate temperament and lack of explosive rage towards the mother (and lack of same by the mother), is a critical variable that separates the custodial capacities of the mother and the father.
As noted above, the Court is well aware of the significant and recent decision by the First Department in Bridget M., supra. That case shares some elements with the case before this Court. That case had a very angry mother, who was coaching the child and was making false allegations of sex abuse, a type of conduct that Judge Saxe (concurring) labeled "abhorrent." Id., at 432. Here, in the law guardian's summation language, we have the mother's "unrelenting determination to discredit [Dr. W.] and separate him from [the child]."
However, there are several important distinguishing features between the two cases. In Bridget M., the Court had noted that the children were thriving and that there was no evidence of any harm to them. In this case, although the child is described as essentially "normal," the mother [*14]herself is advancing claims of emotional disturbance by the child, such as serious sleep disturbances. To the extent that the mother's own allegations can be credited even to some degree, the child is already beginning to experience some emotional difficulties.
Further, an important variable in Bridget M. was the appellate court's skepticism that the father, if granted custody, would actually exercise full custodial responsibilities. This contrasts with the instant case, in which the father is a physician, whose practice and offices are in New York City, and who always has spent and will continue to spend consistent custodial time with the child.
Finally, although initially the mother exercised primary custodial responsibility during the child's early infancy, in more recent years these responsibilities have been shared, or exercised more by the father.
To be clear, this Court has never viewed the issue of obstruction of or interference with the other parent's access as a per se determinant of custody, as Bridget M. so cautions. Instead, in this case, the Court has considered all the circumstances concerning the subject child's best interests and has determined that the father can provide a far superior emotional climate for the child, in addition to supporting access with the noncustodial parent.
Accordingly, for the reasons delineated above, the father is granted legal and physical (residential) custody of the subject child. The mother's visitation (access) with the child may take one of two primary forms: (1) alternate weekends, Friday to Monday morning, and an early or midweek overnight in between; or (2) three weeks with the father and one week with the mother; during one of the father's three weeks, the mother shall have an overnight Saturday to Sunday visit. In addition, the mother shall have three summer weeks with the child, either continuous or split depending on the child's activity scheduling. Other vacation time and school holidays shall be divided. Under no circumstances may the mother videotape or audiotape the child.
SETTLE ORDER ON NOTICE