OPINION OF THE COURT
Jeffry H. Gallet, J.
The parties are the parents of three children, Lisa, age 13, Jennifer, age 10, and Heather, age 5. Lisa is in the custody of her father while Jennifer and Heather are in their mother’s custody. The mother brings this proceeding for Lisa’s custody.
ISSUES
In addition to a determination of the best interests of the children involved, this proceeding raises several previously unanswered questions as to the status of stepparents, the ability of the Family Court to modify orders of other courts, and the duty of a custodial parent to compel a recalcitrant child to visit the noncustodial parent.
THE STATUS OF THE STEPPARENTS
Before approaching the merits of the proceeding, it is important to clarify the status of the father’s second wife and the mother’s second husband. Since many divorced parents remarry, *299 courts are beginning to focus on the question of the effect of stepfamilies on children and the rights and obligations of stepparents (Atkinson, Criteria for Deciding Child Custody in the Trial and Appellate Courts, 18 Family LQ 1, 34 [spring 1984]). While stepparents have no independent right in relation to their stepchildren, they do derive certain legal and de facto rights and obligations as the spouse of a parent.
Stepparents are obligated to support their stepchildren under certain circumstances (Family Ct Act § 415; Department of Welfare v Siebel, 6 NY2d 536 [1959]) and have standing to sue for custody or visitation (Matter of Tyrrell v Tyrrell, 67 AD2d 247 [4th Dept 1979], affd 47 NY2d 937 [1979]; Matter of Trapp v Trapp, 126 Misc 2d 30 [Fam Ct, Onondaga County 1984]) but are required to prove extraordinary circumstances as defined by the Court of Appeals in Matter of Bennett v Jeffreys (40 NY2d 543 [1976]) to be successful. As a practical matter they act as parents while their stepchildren are with them. They discipline the children, function as family members in social situations and as adult role models.
In addition, stepparents, their own children and their extended families are important parts of the natural parent’s life and as such are important to their stepchildren. It is not inappropriate for a natural parent to strive to build a positive relationship between the child and the stepparent and his or her family. However, the parent and stepparent must not allow that positive relationship to replace that of the child with the other natural parent and natural family. While it is proper to use visitation periods to foster the relationship between the child and the stepfamily, that should not be the primary focus of visitation.
In essence, in most instances the stepparent acts as the agent of the parent, from whom he or she derives his or her rights and authority. The parent is generally responsible for his or her spouse’s acts. In this case, there is some question of whether the father was aware of some of his wife’s actions. Where, as here, the stepparent acts openly, without any attempt to hide her actions from her husband, he will be held accountable for them.
FACTS
Although these parties have appeared before more than a score of Family, Supreme, Surrogate’s and Criminal Court Judges, this trial was the first full evidentiary hearing. The trial ran over 20 days during which, among other witnesses, both parents and both stepparents testified and hundreds of pages of documents, including two volumes of the father’s personal diary, *300 and several hours of taped telephone conversations were received in evidence.
Before proceeding with the findings of fact, an examination of the credibility of the witnesses is necessary. It is not unusual in cases of this kind for parties to have different perceptions of events. Memories dim with the passage of time and are influenced by the emotionally charged situations. Under such circumstances, parties and their spouses are rarely absolutely credible in their testimony and this case is not an exception. One witness, however, was particularly lacking in credibility.
The stepmother’s testimony was frequently contradicted by other evidence and her own inconsistent statements. She was evasive, even under examination by her husband’s lawyer, and admitted making untrue statements to the Surrogate’s Court under oath. That, together with her demeanor on the witness stand, led me to discredit much of her testimony.
The petitioner and respondent were married in July of 1970 and divorced in March of 1979 with the mother receiving custody of the children. Several months thereafter, the father married the stepmother, with whom he had been involved while married to the mother. Indeed, there had been a confrontation, initiated by the stepmother, between the mother and stepmother before the father and mother separated and while the mother was pregnant with Heather. The Supreme Court found that during the marriage the father had struck the mother and on another occasion grabbed her by the throat and attempted to choke her. It is, therefore, not surprising that the relationship between the father, mother and stepmother was frequently less than cordial. Nor is it surprising that the hostility of the three adults affected their relationships with the children and with each other when dealing with questions of child support, custody and visitation. The problem was exacerbated by the stepmother’s inability to conceive a child of her own.
From 1979 through the end of 1982, there were numerous disputes about visitation and child support, many of which resulted in litigation in the Supreme and Family Courts. In January of 1983, at her request, and with the agreement of her parents, Lisa went to live with her father while Jennifer and Heather remained with their mother.
The parties stipulated to a schedule of visitation of each noncustodial parent with the children for the years 1983 and 1984. That schedule shows visitation for the father if he saw either Jennifer or Heather. There were occasions when either Jennifer or Heather did not visit and the parties disagree as to *301 whether the child was actually too ill to visit; those disputes were de minimus in analyzing the visitation patterns.
In 1983, the father had visitation on 135 of 365 days or approximately 37% of the days. He had visitation every week that year. In 1984, excluding the month of December which was not complete in the schedule, he had visitation 124 of a possible 335 days or approximately 37% of the days. He had visitation all but one week. Not included in those calculations were the times the father saw Jennifer at her school to give her “snacks” or the extensive visitation he had with her while she was hospitalized from May 14 to June 21, 1984.
On the other hand, in 1983, excluding the month of January when Lisa’s residence changed, the mother had visitation only 22 of 334 days or 61/2% of the days. In 1984, again excluding December, she saw Lisa only 7 of a possible 335 days or 2% of the days. Significantly, all of her visitation occurred after the commencement of this proceeding and under direct court supervision.
The father explained the mother’s lack of visitation with Lisa by saying that the child refused to go. That position is in marked contrast to his position when Heather refused to visit him. He, faced with Heather’s refusal, appropriately forced her to visit with him. When asked why visitation took place after the commencement of this proceeding he responded that he told the child she must go and she obeyed.
The mother testified to interference with her telephone contact with Lisa. That testimony was contradicted by the stepmother’s testimony. I credit the mother’s testimony.
As far back as 1981, the father taped his telephone conversations with the mother. During 1984, he and the stepmother taped Lisa’s conversations with the mother, the maternal grandmother, and Jennifer. This was done with Lisa’s knowledge and must have had a chilling effect on any attempts by the mother to reestablish a normal relationship with her. The father and stepmother also taped their telephone conversations with Jennifer and the mother.
Although the tapes were made by the father and stepmother, and in at least one instance were obviously edited by them, the tapes support the mother’s contention that the father and the stepmother importuned the children regularly and that they involved them in the various litigations among the adults.
On February 2, 1984, the stepmother filed a petition in the Surrogate’s Court to adopt Lisa. The mother contested the *302 adoption and it was ultimately withdrawn with the Surrogate awarding $2,500 in legal fees to the mother. The institution of this proceeding is significant and that significance is emphasized by the admissions by both the father and the stepmother that they were less than candid in their sworn statements to the Surrogate.
The children, their parents and their stepparents were examined by Dr. Alan Levy, an eminent child psychiatrist who was chosen by agreement of the parties to perform an independent psychiatric evaluation. Dr. Levy found “a long history of antagonism between the parties” and an “embittered relationship” but no psychopathology. He recommended that Lisa continue to live with her father under some type of joint custody arrangement which would provide for residence with the father and regular visitation with the mother. He further stated that he had been faced with a “bewildering array of allegations * * * by both sides” but had made no substantial effort at fact finding. He opined that if the court found that the father and stepmother had substantially interfered with the mother’s relationship with Lisa, his recommendation would change and he would recommend that custody be transferred to the mother.
Lisa testified to a strong preference to live with her father.
I find that the behavior of the father and the stepmother, if considered in the light most favorable to them, was overbearing and inconsiderate and characterized by incredibly poor judgment. They seem to thrive on their conflict with the mother and include the children in their battles.
There is a clear pattern of attempts to interfere in the relationship between the mother and Lisa. There is also sufficient evidence to find that the father interfered with the mother’s right of visitation with Lisa.
That is not to say that the mother is entirely blameless or that she always acted appropriately. However, on balance, and particularly during the years 1983 and 1984, her behavior and that of the stepfather were well within acceptable limits and substantially better than that of the father and his wife.
THE LAW
The primary standard to be applied to all disputes involving the custody and visitation of children is the best interests of the child (Friederwitzer v Friederwitzer, 55 NY2d 89 [1982]; Eschbach v Eschbach, 56 NY2d 167 [1982]). In searching for a child’s best interests, the court is not bound by prior agreements of the parents, nor must it accord res judicata status to prior orders. *303 (Matter of Louise E.S. v W. Stephen S., 64 NY2d 946 [1985]; Friederwitzer v Friederwitzer, supra; Eschbach v Eschbach, supra; Entwistle v Entwistle, 61 AD2d 380 [2d Dept 1978], appeal dismissed 44 NY2d 851 [1978].) The court, in order to fully understand the circumstances, may hear evidence previously presented to the courts but is bound by their prior findings of fact (Matter of Larisa F. v Michael S., 120 Misc 2d 907 [Fam Ct, Queens County 1983]). Neither parent begins with a prima facie right to custody (Gallant v Gallant, 104 AD2d 147 [1st Dept 1984]).
While there are no absolutes in making these determinations, among the factors to be considered are the child’s current residence, the agreement between the parties, the home environment and parental guidance the custodial parent provides, the child’s wishes and residence with the child’s siblings (Matter of Louise E. S. v W. Stephen S., supra; Eschbach v Eschbach, supra). In addition, the court is obligated to protect the noncustodial parent’s visitation rights (Weiss v Weiss, 52 NY2d 170 [1981]).
The right to visitation has been considered so basic that interference with visitation has been held to be an act so inconsistent with the best interests of the children as to raise a strong probability that an interfering parent is unfit to act as the custodial parent (Entwistle v Entwistle, supra; see also, Matter of Paris v Paris, 95 AD2d 857 [2d Dept 1983]; Matter of Burkart v Montemarano, 72 AD2d 561 [2d Dept 1979]). The father’s defense that the child preferred not to visit must be rejected (Mahler v Mahler, 72 AD2d 739 [2d Dept 1979]; see also, King v King, 124 Misc 2d 946 [Sup Ct, NY County 1984]). He has an affirmative duty to insure that visitation occurs (Joye v Schechter, 118 Misc 2d 403 [Fam Ct, Nassau County 1983]). Here he has proved that he could effect visitation if he wanted it to occur which leads one to doubt his protestation that he encouraged visitation previously. The history of this case and the father’s behavior in allowing Lisa to get a job she has to perform during her visitation time with the mother does not indicate a positive prognosis for future visitation if Lisa continues to reside with the father.
The wishes of the child, although they must be considered, are not dispositive (Eschbach v Eschbach, supra; Feltman v Feltman, 99 AD2d 540 [2d Dept 1984]). The Appellate Division has upheld this principle with a child of Lisa’s age (Pino v Pino, 57 AD2d 919 [2d Dept 1977]). In evaluating Lisa’s opinion, the court must consider her age and possible influence by the father *304 and the stepmother (Eschbach v Eschbach, supra). The history of this case compels the court to give limited weight to Lisa’s preference.
In this case, absent the problems in visitation and the relationship of the parties to each other, these households and the parties’ qualifications to parent are essentially equal. It is, then, a balancing of the child’s wishes and the stability of her more than two-year residence with her father against the father’s efforts to separate Lisa from her mother which will be dispositive.
The Court of Appeals cautions us not to change a child’s residence of long standing in the “ ‘absence of countervailing circumstances on consideration of the totality of circumstances’ ” (Friederwitzer v Friederwitzer, supra, at p 95; see also, Gallant v Gallant, supra). The hostility between the parents compels the rejection of Dr. Levy’s joint custody recommendation (Matter of Blake v Blake, 106 AD2d 916 [4th Dept 1984]). One parent must be awarded custody.
Since the effects on Lisa of a change of custody are relatively short term and the effects of a rupture of her relationship with her mother long term, the father’s history of interference with Lisa’s relationship with her mother and the probability of its continuance tips the balance in the mother’s favor. Lisa’s custody must be granted to the mother.
ORDERS OF OTHER COURTS
These parties have moved from court to court in our fragmented court system leaving numerous orders of the Supreme, Family, Surrogate’s and Criminal Courts in their wake. It was the father and stepmother who were the primary forum shoppers, but it is difficult to blame them for using a system which invites such abuse. However, the problem of the multiple orders must be addressed.
The Family Court is a court of limited jurisdiction (NY Const, art VI, § 13 [b]; Matter of Mouscardy v Mouscardy, 63 AD2d 973 [2d Dept 1978]). However, in matters concerning the custody or visitation of minors, the Family Court possesses all of the powers of the Supreme Court (Family Ct Act § 651 [b]). The Supreme Court has general original jurisdiction over all. actions and proceedings in law and equity (NY Const, art VI, § 7 [a]; Kaplan v Meskin, 108 AD2d 787 [2d Dept 1985]). With that jurisdiction, the Supreme Court may modify its own orders and, in the proper circumstances, those of other trial courts, including the Criminal and Surrogate’s Courts. When considering *305 questions of custody and visitation, the Family Court may do the same.
Accordingly, all prior orders of all courts affecting the custody and visitation of Lisa, Heather and Jennifer are vacated except as specifically provided in this decision and order. All agreements between the parties are similarly void. All inconsistent orders of protection of the Supreme or Criminal Courts are modified to conform herewith to the extent they are inconsistent. The order of protection of the Supreme Court of December 12,1979 in favor of the mother and the maternal grandmother is continued unmodified.
The Criminal Court’s mutual orders of protection in favor of the mother, the stepfather and the stepmother and the orders of the Surrogate’s Court are unaffected for lack of personal jurisdiction over the stepparents.
DECISION
Custody of Lisa is transferred to the mother, effective 10 days after service upon the father of a copy of this order.