Matter of M.N. (2006 NY Slip Op 52580(U))

[*1]

Matter of M.N.

2006 NY Slip Op 52580(U) [14 Misc 3d 1238(A)]

Decided on November 2, 2006

Family Court, Monroe County

Ruhlmann, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected in part through March 14, 2007; it will not be published in the printed Official Reports.

Decided on November 2, 2006

Family Court, Monroe County
In the Matter of M.N., M.H., J.H., T.W., C.H., and N.H., Children Under Eighteen Years of Age Alleged to be Severely Abused and Neglected by J.H. and M.H.S., Respondents.
NA-11072-05

APPEARANCES:
Monroe County Law Department, by Peter A. Essley, Esq., for Petitioner
Public Defender's Office, by Michael A. Lacignina, Esq., for Respondent
J.H.
Legal Aid Society, by Deral D. Givens, Esq., Law Guardian

Dandrea L. Ruhlmann, J.
This case addresses whether an incarcerated mother, imprisoned based upon her conviction to first degree assault against her step-son after a guilty plea, should have any contact with her four biological children. Based upon such criminal conviction, this Court granted Petitioner Monroe County Department of Social Service's (Petitioner) motion for summary judgment finding that Respondent J.H. (Respondent) severely abused step-son J.H. and derivatively abused and neglected step-son M.H. and biological sons M.N., T.W., C.H. and N.H.. A dispositional hearing was held on October 18, 2006. On October 31, 2006, counsel presented closing arguments.
Petitioner's proposed dispositional plan contains an order of protection prohibiting Respondent from any contact with all of the children "until recommended by the children's therapist in conjunction with (Petitioner) and the Law Guardian." Respondent contends that she should be permitted supervised visits and correspondence with her four biological sons, M.N., T.W., C.H. and N.H.. The Court finds that it is in the best interests of M.N, T.W., C.H. and N.H. that Respondent have contact with them. Respondent does not seek contact with either of her step-sons, M.H. or J.H., the victim of her assault. The Law Guardian states that M.H. does not want contact with Respondent. The Court finds that it is in the best interests of M.H. and J.H. that Respondent have no contact with them.
Statement of Facts:
Respondent lived in Arkansas where her two eldest sons, M.N. and T.W., were born of different fathers. M.H.S. married C.C. locally and had two sons, M.H. and J.H.. C.C. passed away suddenly. Sometime in 2002 M.H.S. and Respondent developed a relationship and Respondent moved with her two sons, M.N. and T.W., into the M.H.S. household. M.H.S. and Respondent married and together had two more sons, C.H. and N.H.. M.H.S. is a truck driver and was often away from home for five days out of a week leaving Respondent as the primary caretaker for the six boys. On or about August 24, 2005, when M.H.S. was away working, J.H., the younger son from the union of M.H.S. and C.C., was hospitalized with extensive neurological, shaking-associated injuries. All six boys were removed from Respondent and M.H.S. and placed in the home of L.C. and L.C., maternal grandparents to only M.H. and J.H., with extensive visitation to M.H.S..[FN1] As part of a temporary order, Respondent was granted weekly visitation with her youngest boys, C.H. and N.H.. Respondent pled guilty in County Court to the first degree assault of her step-son, J.H., and received a sentence of incarceration of thirteen years and six months (13 1/2 years) with five (5) years post release supervision. On May 18, 2006, as part of Respondent's punishment, County Court issued orders of protection prohibiting Respondent from contacting any of the boys for sixteen (16) years. Based upon Respondent's conviction, this Court granted Petitioner's motion for summary judgment finding that Respondent severely abused J.H. and derivatively abused and neglected M.H., M.N., T.W., C.H. and N.H.. A dispositional hearing was held on October 18, 2006. Only two witnesses testified: Caseworker Linda Krehling and Respondent herself.
Krehling testified that she was assigned this case in February or March of this year. As a dispositional plan for Respondent, she proposes that Respondent undergo mental health and psychiatric evaluations, and engage in mental health treatment, anger management, domestic violence, parenting skills and nutritional counseling programs. She additionally recommends that Respondent have absolutely no contact with any of the boys until she completes treatment. Then, contact "may be something to look at." Krehling based this recommendation upon conversations with M.H.S. and grandparents L.C. and L.C.. She also spoke with the children's prior daycare provider once in September and with M.H.'s and M.N.'s therapist twice over the telephone - once in September and once the day before the dispositional hearing.
Pursuant to this Court's order N.H. and C.H., M.H.S. and Respondent's biological sons - who were respectively one and two years old - had weekly visitation with Respondent in the general visiting open area of the local jail from October 2005 until May 2006 when County Court issued the orders of protection - more than 30 visits. Krehling testified that the visits were supervised by a woman named Lori (she did not know Lori's last name) and that she personally supervised only one visit. She stated that the visits did not go well but admits both that the visits were never ended early nor was there any inappropriate interaction between Respondent and the[*2]boys. Krehling was told that during the visits N.H. and C.H. did not reach for Respondent and warmed to her "only a little bit," instead clinging to the visitation worker. Respondent explained however that the visits occurred at a table where she was separated from the visitation worker and boys by a glass, eye-level partition and the boys had to be lifted up and over the partition to come to her. Krehling was also told that during visitation the infant and toddler hit and pulled Respondent's hair. Respondent testified to the contrary that although the boys were timid at first, they warmed to her and together they laughed, played and sang songs. During these proceedings, this Court also ordered a representative from the law guardian's office to monitor the visitation. A representative observed one visit in October 2005 and reported that while C.H. was at first hesitant to go to Respondent, he eventually warmed to her. The visit was otherwise unremarkable.
From the onset of the visits until September of this year, C.H. and N.H. attended T.B. Daycare Center full time. Krehling testified that she spoke with a former daycare provider once in September and was told that C.H. and N.H. became more aggressive after visiting with Respondent but with time the boys' aggressive behavior lessened. The daycare provider also told her that after the visits ended the boys acted up only once or twice a week compared with daily. Yet, Krehling admits both that the young boys do not receive counseling and there was never a diagnosis to link the boys' aggressive behavior to visitation with Respondent. Krehling never spoke with anyone from the boys' current daycare center.
Respondent's eldest son, M.N., attends counseling with a therapist who is a certified social worker. Krehling recently spoke with the therapist twice on the telephone and he informed her that he does not currently recommend visitation - or any form of communication - between Respondent and any of the boys. According to Krehling, the therapist believes that Respondent must be engaged in mental health treatment to appropriately discuss the family's situation with the boys. Krehling admits that the therapist's assessment is based only on what both she and grandparents L.C. and L.C. told him, as he never even met T.W., C.H. or N.H.. M.N. in fact told the therapist that he wants to see his mother but he is conflicted about his anger. Disconcertingly, now five-year-old T.W. has never engaged in counseling and has had no visits with Respondent. He is currently living with M.H.S. and the Grandparents L.C. and L.C., although not biologically related to them. The Law Guardian confirmed too that, like M.N., T.W. would like to visit with his mother.
Respondent testified that she will cooperate with Petitioner and comply with all services recommended in the proposed dispositional plan. She has already attempted to engage in services but because she was held temporarily in a local jail during the pendency of these legal proceedings she was able to begin only mental health treatment. She testified that once in her permanent correctional facility, she will fully engage in anger management, domestic violence and parenting classes. She hopes to see her sons - or, in the least to call and write them - to let them know that she loves them. Eventually Respondent would like to see her sons placed with her sister or father in Arkansas. No custody petition was filed at the time of this decision.
Statement of Law:
Criminal Orders of Protection and Visitation
Despite Respondent's criminal conviction and the criminal orders of protection prohibiting Respondent from contact with any of her sons for sixteen (16) years - when all of the boys will have reached the age of majority - this Court is required to hold a hearing to determine [*3]what disposition is in the boys' best interests (Matter of Michael V., 83 NY2d 178 [1994]). In Matter of Michael V., the court held that family court erred in failing to hold a dispositional hearing for respondent father who was convicted in criminal court of 15 acts of sodomy: "By dispensing with a dispositional hearing, family court limited its ability to make an informed judgment as to the need for alternative or additional dispositional remedies in the children's best interests." Matter of Michael V. was remitted to family court and in a later decision after family court reissued an order of protection barring any contact between father and children but again failed to hold a dispositional hearing, the Appellate Division, Second Department again remitted the matter: "At a minimum, the court should have requested a report from the children's therapists attesting to their status. . . a careful, current assessment of the children's condition and needs must be made" (Matter of Michael V., 219 AD2d 713 [2d Dept 1995]). Similarly, here, despite the criminal orders of protection, this Court must address the boys' individual needs (see also Matter of Dominique A.W., 17 AD3d 1038 [4th Dept 2005], lv denied 5 NY3d 706 [2005] [a law guardian should present and advocate a specific dispositional plan to the court and, where appropriate, apprise the court of the children's individual wishes]).
As outlined in People v Roselle (84 NY2d 350, 357 [1994]), a child protective proceeding can take place in family court while a criminal prosecution goes forward arising out of the same conduct because of the different purposes of the courts, different standards of proof and dispositional alternatives. The desired end of the article 10 proceeding is to ensure the expeditious protection of the children's welfare, not to punish Respondent (People v Roselle, 84 NY2d at 357). This Court may consider the criminal orders of protection but its determination is not bound by them - in fact, it would be error to consider only such orders - instead this Court must consider all factors affecting the boys' best interests.[FN2]
The only case on point where a court confronted the issue of visitation in a family court proceeding after a criminal order of protection was already in place is Matter of Curtis "N" (288 AD2d 774 [3d Dept 2001], lv denied 97 NY2d 610 [2002]). There, family court did not permit respondent father visitation with his children but based its determination not only on respondent's incarceration and the criminal order of protection, but also on a summary and assessment of respondent who had sexually abused his daughter.[FN3] Indeed, incarceration and an accompanying criminal order of protection are important factors to consider but there are others. The Court in Matter of Curtis "N" (288 AD2d 774 [3d Dept 2001], lv denied 97 NY2d 610 [2002]) relied on a line of Family Court Article 6 (custody/visitation) cases finding that [*4]incarceration alone does not render visitation with the imprisoned parent inappropriate (Badger v Murray, 283 AD2d 695, 695-696 [3d Dept 2001]; La Rue v Crandall, 254 AD2d 633, 634 [3d Dept 1998]; Headsail v Headsail, 249 AD2d 853 [3d Dept 1998], lv denied 92 NY2d 809 [1998]; see also Cook v Morales, 275 AD2d 938 [4th Dept 2000]; Lonobile v Betkowski, 261 AD2d 829 [4th Dept 1999], after remand 295 AD2d 994 [4th Dept 2002]; Davis v Davis, 232 AD2d 773 [3d Dept 1996]; Mohammed v Cortland County Department of Social Services, 186 AD2d 908 [3d Dept 1992], lv denied 81 NY2d 706 [1993]).
"Denial of visitation to an incarcerated parent is a drastic remedy and should only be done where there are compelling reasons . . . and . . . substantial evidence that such visitation is detrimental to the child's welfare" (Lonobile v Betowski, 261 AD2d at 829, after remand 295 AD2d 994 [emphasis added]). In Lonobile, the Court remitted the case to family court for a determination whether visitation would be detrimental to the child. Family court upon remittal did determine that visitation would be detrimental - but only after specific testimony from a clinical psychologist that no good would come from visitation and that any relationship should be developed in a supervised therapeutic manner. The propriety of visitation is generally left to the sound discretion of family court whose findings are accorded deference and will remain undisturbed unless lacking a sound basis in the record (Matter of Edward S. v Moon, 7 AD3d 834, 836 [3d Dept 2004]). Like in Lonobile (261 AD2d 829), courts prohibiting visitation with an incarcerated parent do not rely on incarceration alone but instead upon "substantial proof" that visitation would be harmful to the children or not in the children's best interests (Headsail v Headsail, 249 AD2d at 853 [where imprisoned father attempted to kill child's mother in child's presence]; La Rue v Crandall, 254 AD2d at 635 [where children expressed a clear desire to have no contact with imprisoned parent and there was evidence of inappropriate communication from parent to children]; Badger v Murray, 283 AD2d 695, 695-696 [where during one of three prison visitations imprisoned parent struck child in his face and parent failed to establish a meaningful relationship with child]; Cook v Morales, 275 AD2d 938 [where a court-appointed therapist recommended that visitation with imprisoned parent not take place]; Davis v Davis, 232 AD2d 773; Mohammed v Cortland County Department of Social Services, 186 AD2d 908 [where both counselors and a child psychologist testified that visitation with imprisoned parents would be harmful]).
In Matter of Edward S. (7 AD3d at 837), the Court credited testimony from a social worker and caseworker with the county mental health clinic who both opined, based upon evaluations of the children, that visitation would be harmful. Both testified that because the children were doing well in their new foster homes that visitation would potentially undermine the children's sense of stability. Unlike that case, M.N., T.W., C.H. and N.H. do not have such a sense of stability.
Here, Petitioner has failed to offer substantial proof that visitation would be harmful to Respondent's biological sons or that visitation is not in their best interests. Krehling testified that during the more than 30 visits that C.H. and N.H. had with Respondent that the boys were initially timid toward Respondent and both pulled her hair and hit her. There was no testimony that this is unusual behavior for an infant and toddler - both under three years old - in a setting in which the boys were separated from their mother by a glass partition. Although Krehling was also told by the former daycare provider that the visits caused the boys to act out, there was no evidence linking the aggressive behavior to the visits. While M.N.'s therapist told Krehling that [*5]he did not recommend contact between Respondent and the boys, Krehling admits that such recommendation was based upon information received from the grandparents L.C. and L.C.. The parents of M.H.S.'s former wife and Respondent have an understandably strained relationship. The therapist never even met T.W., C.H. or N.H. and M.N., in fact, told the therapist that he would like to visit with Respondent.
Here the boys still require stability. The Court commends the grandparents L.C. and L.C. for stepping in and assisting in caring for the boys. Notably all six boys were legally returned to M.H.S. who received a suspended judgment. Yet the fact remains, and both M.H.S. and the grandparents L.C. and L.C. acknowledge, that the current living situation is evolving. Two of the six boys, M.N. and T.W., are not biologically related to the grandparents L.C. and L.C. or M.H.S. and there was some evidence that Respondent's family in Arkansas may petition for custody. Additionally both M.N. and T.W. express that they want contact with Respondent.
Respondent was the primary caretaker for the boys since their births. This is not a termination of parental rights proceeding, Respondent remains the boys' mother and the goal for this case is "return to parent." While Respondent will be incarcerated for thirteen years and six months (13 1/2 years) when the boys will have reached or will be close to the age of majority, contact between Respondent and the boys will afford them a relationship - albeit not a traditional mother/son relationship (see Matter of Jovan J., 7 Misc 3d 1028[A], 2005 NY Slip Op 50795(U), *2 [2005]). Respondent is currently engaged in mental health treatment and testified that she will commence the other required treatment immediately upon her permanent placement at BH Correctional Facility.[FN4] The boys' therapist did not rule out communication between Respondent and the boys but indicated only the necessity of mental health treatment for Respondent to communicate appropriately with the boys about their situation. The Law Guardian and even Petitioner agree that the issue of visitation could be revisited upon Respondent's completion of treatment. Any visitation would be supervised and any communication between Respondent and the boys monitored. The Court envisions an on-going check on the progress of the visits and the boys' conditions. The dispositional plan shall be fashioned accordingly.
Dispositional Plan
Petitioner submitted a proposed dispositional plan to the Court which included an order that Respondent:
Have no contact in any form whatsoever with the children [sic] place of business, school, day care or any place they may be found until recommended by the children's therapist in conjunction with [Petitioner] and the Law Guardian. The forms of contact prohibited by this Order shall include, but not be limited to, personal, telephone, letters, notes, video or audio tapes and third party communications.
A Court cannot delegate its authority to determine issues involving the best interests of the children to a mental health professional (Matter of Sullivan County Department of Social Services v Richard "C", 260 AD2d 680 [3d Dept 1999], lv dismissed 93 NY2d 958 [1999]; see also Kathleen M.K. v Brian S.R., 24 AD3d 1273 [4th Dept 2005]; Hameed v Alatawaneh, 19 AD3d 1135 [4th Dept 2005]). [*6]This Court thus certainly cannot defer its authority to the children's therapist, Petitioner and Law Guardian as detailed in the proposed order of protection. This order of protection shall be stricken in its entirety. In its place Petitioner is ordered to re-draft an order of protection prohibiting contact between Respondent and her step-sons, M.H. and J.H. only.
Petitioner shall also craft a compromise allowing Respondent contact with her biological sons, M.N., T.W., C.H. and N.H.. Respondent is serving a sentence of thirteen years and six months (13 1/2 years) in BH Correctional Facility - located approximately five hours away. M.N., T.W., C.H. and N.H. shall be afforded at least bi-monthly supervised visits with their mother balancing their need and desire to see their mother with the burden on them in making such a long trip (see Davis v Davis, 232 AD2d 773 [3d Dept 1996]). Respondent and her biological sons likewise shall be permitted written correspondence provided that such correspondence is monitored to ensure its appropriateness.
Respondent must engage in mental health treatment and she should not discuss with her sons what happened until both she and the boys are able to do so in an appropriate therapeutic manner. Respondent is currently engaged in mental health treatment. Respondent shall engage in the other proposed treatment services. Likewise, M.H. and M.N. must continue with therapy. Petitioner shall arrange for T.W. to begin therapy and shall have an assessment performed to determine whether N.H. and C.H. should begin some form of therapy as well.
This decision does not in anyway affect the criminal sentence - including the orders of protection - imposed by County Court. It is Respondent's burden to petition that court for modification.
Now, therefore, it is hereby
ORDERED that the Order of Protection in the proposed dispositional plan is stricken in its entirety; and it is further
ORDERED that an Order of Protection be redrafted as concerning M.H. and J.H.; and it is further
ORDERED that Petitioner shall submit a revised dispositional plan within fifteen (15) days consistent with this decision; and it is further
ORDERED that Petitioner shall arrange for T.W. to begin therapy and shall obtain a professional assessment regarding whether C.H. and N.H. should begin some form of therapy.
Dated this 2nd day of November, 2006, at Rochester, New York.
___________________________
HON. DANDREA L. RUHLMANN
FAMILY COURT JUDGE
Pursuant to §1113 of the Family Court Act, an appeal must be taken within thirty days of receipt of the order by appellant in Court, thirty-five days from the mailing of the order to the appellant by the Clerk of the Court, or thirty days after service by a party or law guardian upon the appellant, whichever is earliest.

Footnotes

Footnote 1: M.H.S. eventually consented to a neglect finding and received a suspended judgment. By order entered October 11, 2006, the children were returned to M.H.S. and grandparents L.C. and L.C. currently have extensive visitation with the children from Sunday until Tuesday morning.

Footnote 2: See Spenser v Spenser (128 Misc 2d 298, 304-305 [Fam Ct, Queens County 1985]) for an interesting discussion of the complication of conflicting orders of protection issued by other courts as they affect custody and visitation orders issued by family court.

Footnote 3: Family court later summarily terminated respondent father's parental rights and the Third Department affirmed based again, in part, upon the criminal order of protection and because respondent was not challenging the protective order (Matter of Curtis "N", 302 AD2d 803, 804-805 [3d Dept 2003], lv dismissed 100 NY2d 535 [2003]). The determination was also based on the facts that respondent failed to plan for his children's future and did not take any responsibility for sexually abusing his daughter.

Footnote 4: The Court presumes that Respondent has commenced with the other treatment at this time as the Court dispensed with her presence at the conclusion of this hearing in order for her to return to BH Correctional Facility.